MITCHELL D. GLINER, ESQ.
Nevada Bar #003419
3017 West Charleston Blvd., #95
Las Vegas, NV 89102
(702) 870-8700
(702) 870-0034 Fax
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

CARLOS HERNANDEZ,

    Plaintiff,

vs.

WELLS FARGO FINANCIAL
NATIONAL BANK,

    Defendant.

No. 2:13-cv-01769-RCJ-VCF

Date of Hearing: March 20, 2014
Time of Hearing: 9:00 AM

**PLAINTIFF'S RESPONSE TO DEFENDANT'S
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

**I**

**PREFATORY**

Defendant is incorrect in its assertion that its reporting is accurate as a matter of law. First, in attempting to establish its ostensible accuracy, Defendant invokes two unpublished cases neither of which cite the applicable *Ninth Circuit authority*, Drew v. Equifax Information Services, LLC, 690 F.3d 1100, 1108 (9th Cir. 2012). One of the unpublished opinions, Molton v. Experian Information Solutions, Inc., 2004 WL 161494, at *5 (N.D. Ill. Jan 21, 2004), references the Eleventh Circuit's opinion in Cahlin v. General Motors Acceptance Corp., 936 F.2d 1151 (11th Cir. 1991) in an errant attempt to define accuracy under the FCRA. The glaring problem with *Cahlin* [other than it's old and not a Ninth Circuit

opinion] is that it preceded the establishment of the 1996 furnisher amendments under which liability under FCRA § 1681s-2(b) was framed. It's a case against a national credit reporting entity, not a furnisher as defined. Please see <u>Nelson v. Chase Manhattan Mortgage Corp.</u>, 282 F.3d 1057 (9th Cir. 2002).[1] Defendant's second case, <u>Bolick v. DFS Services, LLC</u>, No. 10-05211, 2011 WL 4359987, at *2 (E.D. Pa. Sept. 16, 2011), is a two page decision dismissing the complaint of a *pro se litigant* who "failed to submit <u>any</u> evidence to substantiate his claim."

Second, as referenced in ¶ 19 of the Amended Complaint, Defendant has ignored basic credit reporting industry standards, <u>Cassara v. DAC Services, Inc.</u>, 276 F.3d 1210, 1225 (10th Cir. 2002). Metro 2 is a reporting format used by furnishers like Defendant. The very format embraced by the credit reporting industry itself <u>requires</u> furnishers like Defendant to both acknowledge the transferred status of any account as well as the account's paid status.

## II

### ARGUMENT OF LAW

A. Congress Enacted the FCRA to Enhance the Strength and Competitiveness of the Consumer Credit Economy

Congress enacted the FCRA in 1970 as Title VI of the Consumer Credit Protection Act, 15 U.S.C. §§ 1601-1693r ("CCPA"), its omnibus act regulating the consumer credit industry. A recurring, core CCPA theme is that prudent dissemination of accurate credit information is essential to maintain the vitality of the credit

---

[1] Counsel for Plaintiff represented Mr. Nelson.

2

granting system in a competitive and open marketplace to insure the health of the nation's multi-trillion dollar consumer credit economy and the well being of all its participants, creditors and consumers alike.[2] Congress thus made the following formal findings in adopting the FCRA:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

§ 1681(a)(1).

Congress enacted the FCRA with the expressed purpose to enable credit grantors and others to be in the best position to make reliable lending and other business decisions. § 1681(a) and (b). Likewise, the Truth in Lending Act, Title I of the CCPA, establishes the corresponding principle that consumers are best served through their own "informed use of credit." 15 U.S.C. § 1601(a). "Congress enacted the Truth in Lending Act in part because it believed consumers would individually benefit not only from the more informed use of credit, but also from heightened competition which would result from more knowledgeable credit shopping." Till v. SCS Credit Corp., 541 U.S. 465, 482, 124 S.Ct. 1951, 1963 (2004) (quotation and footnote omitted). The Supreme Court stated the guiding principle of this congressional philosophy

---

[2] Total outstanding consumer credit as of September 2011 was nearly $2.5 trillion. See http://www.federalreserve.gov/Releases/G19/Current.

nearly 40 years ago: "[B]lind economic activity is inconsistent with the efficient functioning of a free economic system such as ours." Mourning v. Family Publication Serv., Inc., 411 U.S. 356, 364, 93 S.Ct. 1652, 1658 (1973). Simply put, the viability of our credit economy depends on accurate information; Congress designed the FCRA to increase that accuracy.

In 1996 Congress amended the FCRA [Pub.L. 104-208 (Sept. 30, 1996)], as explained by the Senate Report:

> Currently, the FCRA contains no requirements applying to those entities which furnish information to consumer reporting agencies. Section 413 imposes certain obligations upon those furnishers of information to consumer reporting agencies. The Committee believes that bringing furnishers of information under the provisions of the FCRA is an essential step in ensuring the accuracy of consumer report information.

S. Rep. 104-185, 104th Cong., 1st Sess. 49 (1995); see Nelson v. Chase Manhattan Mortgage Corp., 282 F.3d 1057, 1059-60 (9th Cir. 2002).

Among the changes that Congress made was to enact § 1681i(a)(2), which compels CRAs to promptly notify the furnisher of disputed information of the consumer's dispute, and § 1681s-2, which imposes on those furnishers of information, such as Defendant, detailed and specific responsibilities, including the following duties in subsection (b) [as later amended Pub.L. 108-159 (Dec. 4, 2003)] that are triggered by the CRA's dispute notification and that Defendant violated here:

4

b) Duties of furnishers of information upon notice of dispute

    (1) In general

After receiving notice pursuant to section 1681i(a)(2) of this title of a dispute with regard to the completeness or accuracy of any information provided by a person to a consumer reporting agency, the person shall--

    (A) conduct an investigation with respect to the disputed information;

    (B) review all relevant information provided by the consumer reporting agency pursuant to section 1681i(a)(2) of this title;

    (C) report the results of the investigation to the consumer reporting agency;

    (D) if the investigation finds that the information is incomplete or inaccurate, report those results to all other consumer reporting agencies to which the person furnished the information and that compile and maintain files on consumers on a nationwide basis; and

    (E) if an item of information disputed by a consumer is found to be inaccurate or incomplete or cannot be verified after any reinvestigation under paragraph (1), for purposes of reporting to a consumer reporting agency only, as appropriate, based on the results of the reinvestigation promptly--

        (i) modify that item of information;

        (ii) delete that item of information; or

        (iii) permanently block the reporting of that item of information.

Federal Courts of Appeals long ago established that the § 1681s-2(b)(1)(A) directive to furnishers to "conduct an investigation with respect to the disputed information" required a "reasonable investigation," that is, a "careful" or "searching

inquiry," as opposed to a "superficial" one, "to determine whether the disputed information can be verified." Johnson v. MBNA America Bank, NA, 357 F.3d 426, 430-31 (4th Cir. 2004); accord Westra v. Credit Control of Pinellas, 409 F.3d 825, 827 (7th Cir. 2005). The Courts of Appeals continue to unanimously follow this "reasonable investigation" standard. Gorman v. Wolpoff & Abramson, L.L.P., 584 F.3d 1147, 1157 (9th Cir. 2009); Chiang v. Verizon New England Inc., 595 F.3d 26, 37 (1st Cir. 2010).

In addition, before the operative events here, federal precedent had also established that § 1681s-2(b)(1)(C)'s duty to "report the results of the investigation to the consumer reporting agency" incorporates the obligation from § 1681s-2(a) "that furnishers have a general duty to provide accurate and complete information" to the CRAs when so responding. Saunders v. Branch Banking and Trust Co. Of Va., 526 F.3d 142, 149-50 (4th Cir. 2008).

The context within which to evaluate Defendant's compliance with § 1681s-2(b)(1)(C) is the function that furnishers' investigation reports serve for the credit reporting agencies (CRA). A CRA is obligated, once it receives the furnisher's report, to determine not only whether the disputed information is "inaccurate or incomplete" but also whether it "cannot be verified." § 1681i(a)(5)(A). This task is at the core of the "grave responsibilities" that Congress entrusted to the CRAs. 15 U.S.C. § 1681(a)(4). It is a task that demands independent evaluation, which naturally requires "more than merely parroting information" received from the furnisher. Cushman v. Trans Union Corp., 115 F.3d 220, 225 (3rd Cir. 1997). After all "[t]he FCRA is intended to safeguard against the improper reporting of information

6

on a credit report (either by the credit reporting agency <u>or by the furnisher of credit information</u>) and against the improper disclosure of a credit report." <u>Myers v. Bennett Law Offices</u>, 238 F.3d 1068, 1074 (9th Cir. 2001).[3]

Like many furnishers of information, Defendant has a strong collection incentive to prevent the CRAs from performing their duties as Congress has directed. Defendant's conduct in merely <u>serially parroting verifications</u> would virtually eliminate the CRA's ability to make substantive evaluations of disputed information. That restriction in turn would allow creditors, as Defendant unfortunately demonstrated here, to have a free hand in using the credit reporting system <u>as a pressure point on vulnerable consumers</u>. See, <u>Rivera v. Bank One</u>, 145 F.R.D. 614, 623 (D.P.R. 1993) (a creditor's report of a credit card debt to a CRA is a "powerful tool designed, in part, to wrench compliance with payment terms from its cardholder"); accord, <u>Matter of Sommersdorf</u>, 139 B.R. 700, 701 (Bankr.S.D.Ohio 1991); <u>Ditty v. CheckRite, Ltd., Inc.</u>, 973 F.Supp. 1320, 1331 (D. Utah 1997). Allowing the CRAs to perform their duties as Congress intended requires furnishers to report accurate investigation information to the CRAs and not withhold material information that might aid the CRAs in reaching either a conclusive decision or a decision that the information is unverifiable. See, <u>Johnson v. MBNA America Bank, N.A.</u>, 357 F.3d at 426, 432 and n. 4 (4th Cir. 2004).

---

[3] Counsel for Plaintiff represented Mr. Myers.

LAW OFFICES
MITCHELL D. GLINER
3017 W. Charleston Blvd.
Suite 95
Las Vegas, Nevada 89102
(702) 870-8700

B.  Accuracy under the FCRA.

The Ninth Circuit has defined *accuracy* in an FCRA furnisher case:

> "[A]n item on a credit report can be 'incomplete or inaccurate' ... 'because it is patently incorrect, or because it is misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions.'" <u>Carvalho v. Equifax Info. Svcs., LLC</u>, 629 F.3d 876, 890 (9th Cir.2010) (quoting Gorman, 584 F.3d at 1163) (emphasis added). Although we have never squarely addressed the issue, our precedent suggests that, at the very least, information that is inaccurate "on its face," is "patently incorrect." Id. at 891 (noting that there was no "patent error" because the information reported was "correct on its face"); see also <u>Koropoulos v. The Credit Bureau, Inc.</u>, 734 F.2d 37, 40 (D.C. Cir.1984) (suggesting that under § 1681e, a CRA is liable for reporting information that is "technically untrue," as well as in various other circumstances). A jury may well find that reporting the fraudulently opened account as a lost or stolen account belonging to Drew was untrue or facially inaccurate. <u>Drew v. Equifax Information Services, LLC</u>, 690 F.3d 1100, 1108 (9th Cir. 2012).

Any mere technical accuracy of Defendant's reporting does not achieve FCRA compliance. The FCRA requires more than technical or literal accuracy; it requires "maximum possible accuracy of the information concerning the individual <u>about whom the report relates.</u>" § 1681e(b). To ensure that reporting agencies meet this exacting standard, the FCRA authorizes a consumer to institute the dispute process as Plaintiff did here to challenge the "completeness or accuracy" of any reported item. § 1681i(a)(1)(A).

The District of Columbia Circuit has condemned this type of incomplete and misleading entry:

> First of all, we do not agree with the district court that section 1681e(b) makes a credit reporting agency liable for damages only if the report contains statements that are technically untrue. Congress did not limit the Act's mandate to reasonable procedures to assure only technical accuracy; to the contrary, the Act required reasonable procedures to assure "maximum accuracy." The Act's self-stated purpose is "to require that consumer reporting agencies adopt reasonable

8

procedures for meeting the needs of commerce for consumer credit . . . in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." 15 U.S.C. 1681e(b). <u>Certainly reports containing factually correct information that nonetheless mislead their readers are neither maximally accurate nor fair to the consumer who is the subject of the reports</u>.

. . . .

Applying that interpretation in this case, we find that the district court's dismissal of the Koropoulos' claims by summary judgment on the grounds that the information in the report was technically accurate, regardless of any confusion generated in the recipients' minds as to what it meant, was improper. We find there is a genuine issue of fact as to whether the report was sufficiently misleading so as to raise the issue of whether CBI's procedures for assuring "maximum possible accuracy" were reasonable.

<u>Koropoulos v. Credit Bureau, Inc.</u>, 734 F.2d 37, 40, 42 (D. C. Cir. 1984).

The Fifth Circuit explained Congress' rejection of a mere technical accuracy standard under circumstances where a consumer report stated with regard to the consumer's account, "Litigation Pending:"

Turning to liability under § 1681e(b), any person could easily have construed the notation "Litigation Pending" as an indication that the plaintiff was being sued by Sherwin-Williams, while the actual situation was the reverse. It would have been a simple matter to prevent this ambiguity, particularly in light of Chilton's knowledge of Pinner's dispute with Sherwin-Williams.

<u>Pinner v. Schmidt</u>, 805 F. 2d 1258, 1262-63 (5th Cir. 1986).

Other courts agree that even "a technical truth . . . can be as misleading as an outright untruth where it paints a misleading picture." <u>Swoager v. Credit Bureau of Greater St. Petersburg</u>, 608 F. Supp. 972, 977 (M.D. Fla. 1985) (entry misleadingly coded). In <u>Alexander v. Moore & Associates, Inc.</u>, 553 F. Supp. 948, 952 (D.

9

Haw. 1982), the court posited another example illustrative of the defect in Defendant's "corrected" entry:

> [Section 1681e(b)] does not require that a consumer reporting agency follow reasonable procedures to assure simply that the consumer report be "accurate," but to assure *maximum possible accuracy*". Otherwise it would seem that a consumer reporting agency could report that a person was "involved" in a credit card scam, and without regard to this section fail to report that he was in fact one of the victims of the scam. This result cannot have been contemplated under the Act.

The Fourth Circuit agrees that "A report is inaccurate when it is 'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to [have an adverse]' effect. <u>Sepulvado v. CSC Credit Servs.</u>, 158 F.3d 890, 895 (5th Cir. 1998)." <u>Dalton v. Capital Associated Indus.</u>, Inc., 257 F.3d 409, 415 (4th Cir. 2001) (if report could be read as stating that Dalton was found guilty of a felony, when he pled to a misdemeanour, its inaccuracy would be established). As applied to this case, if the report could be read as stating that Plaintiff's account was neither transferred nor paid, its inaccuracy is established.

The standard for accuracy under the FCRA is not *sui generis*. This type of critical omission of a material fact also constitutes, for example, misrepresentation under common law (Restatement of Torts (Second), §§ 529, 551) and deception under the Federal Trade Commission Act of 1934. <u>Sterling Drug, Inc. v. FTC</u>, 741 F.2d 1146, 1154 (9th Cir. 1984) ("failure to disclose material information may cause an advertisement to be deceptive, even if it does not state false facts"); <u>Simeon Management Corp. v. FTC</u>, 579 F.2d 1136, 1146 (9th Cir. 1978) (deceptive to omit material fact which could affect the consumer's decision to buy); <u>Resort Car Rental System, Inc. v.</u>

LAW OFFICES
MITCHELL D. GLINER
3017 W. Charleston Blvd.
Suite 95
Las Vegas, Nevada 89102
(702) 870-8700

10

FTC, 518 F.2d 962, 964 (9th Cir. 1975) (trade name Dollar-A-Day has a decisive connotation which is deceptive).

C.   The Ninth Circuit has defined accuracy in an FCRA furnisher case in the Disjunctive.

Information on a credit report is inherently inaccurate if it is <u>either</u> patently incorrect or misleading, *Drew,* 1108 (pg. 8, supra). Here Defendant neither reported the account's paid status-notwithstanding explicit notice-nor its subsequent transfer. Plaintiff's dispute was not only sent to the national credit reporting agencies, but also, Defendant itself (Amended Complaint, Exhibits 1-3). Despite the crystal clarity of Plaintiff's dispute Defendant facilely "verified" the accuracy of its reporting sans any reference to either the account's paid status or that the account had been transferred. Further, in an obvious effort to correct the misleading nature of its reporting Defendant finally updated Plaintiff's account to include both the paid status and its subsequent transfer (Amended Complaint, Exhibits 4-5). This attempt to clarify the status of the account exemplifies its inherently misleading status.

In 2002, the honorable Lloyd D. George, Senior District Court Judge, rendered a decision holding that a subsequent "clarification" of an account status belies its previous misleading content:

> Ironically, in an effort to show this Court that the credit report is not misleading, Experian points out that the Spellman's credit report itself notes that the "Primary borrower filed bankruptcy." However, and in an apparent effort to ensure that this Court recognizes that

11

"primary borrower" does not refer to Spellman but to his former spouse, Kathleen, Experian's quote to this Court from the credit report modifies the sentence by adding the name of the former spouse in square brackets: "Primary borrower [Kathleen Spellman] filed bankruptcy." Experian's resort to modifying the credit report to specifically identify Kathleen as the primary borrower <u>best exemplifies</u> that Spellman has adequately alleged that the credit report is misleading <u>Spellman v. Experian Information Solutions, Inc.</u>, 2002 WL 799876 (D. Nev 2002).[4]

Here Defendant's resort to modifying Plaintiff's tradeline "best exemplifies" that its prior reporting is indeed misleading.

D.  It Is Essential That Defendant "Speak the Same Language" as the Remainder of the Credit Industry.

In <u>Cassara v. DAC Services, Inc.</u>, 276 F.3d 1210, 1225 (10th Cir. 2002), the 10th Circuit recognized the essential nature of a common industry language, standard and reporting framework prerequisite to maximizing the accuracy of information contained in a consumer's report. Here, the Defendant failed to comport with the industry standard, notwithstanding evident means to achieve it.

> But if employers in that industry are to communicate meaningfully among themselves within the framework of the FCRA, it proves essential that <u>they speak the same language</u>, and that important data be reported in categories about which there is genuine common

---

[4]  Counsel for Plaintiff represented Mr. Spellman.

12

understanding and agreement. Likewise, if DAC is to "insure maximum possible accuracy" in the transmittal of that data through its reports, it may be required to make sure that the criteria defining categories are made explicit and are communicated to all who participate. Id.

As noted, Metro 2 software is used by the credit reporting industry to establish applicable uniform standards:

> Metro 2 is a standardized reporting format used by furnishers to provide information about customer accounts to CRAs. The Metro format software had been around since the 1970s. Metro 2 is the version created after the 1996 amendments to the FCRA. It was designed by the credit reporting industry, including the so-called "Big Three" nationwide CRAs: Equifax, Experian and Trans Union.
>
> The Metro 2 format and instructions are available for users from CDIA and from each of the major CRAs. CDIA's website also contains valuable information about Metro 2. The format and instructions were initially published in 2000 as the Credit Reporting Resource Guide, which is updated periodically. The book is also called The Metro 2 Manual. <u>Fair Credit Reporting, 8th Edition, pg. 245, National Consumer Law Center, 2013</u>.

Attached as Exhibit 1 is an excerpt from the Credit Reporting Resource Guide. Exhibit 1 reflects the Industry Standard which requires, if applicable, *both* annotation of the account's status to reflect both payment in full for less than the full balance and transfer of the account. Defendant initially provided neither of

13

these revisions instead reporting the account as a charge-off without any regard to the transfer (Amended Complaint, Exhibit 4). Defendant failed to make the necessary revisions until after this action was filed (Amended Complaint, Exhibit 5).

### III

### CONCLUSION

For the foregoing reasons, Plaintiff requests the denial of Defendant's Motion to Dismiss.

Dated:   February 10, 2014

                                        Respectfully submitted,

                                        _____
MITCHELL D. GLINER, ESQ.
Nevada Bar #003419
3017 W. Charleston Blvd., #95
Las Vegas, NV  89102
Attorney for Plaintiff

LAW OFFICES
MITCHELL D. GLINER
3017 W. Charleston Blvd.
Suite 95
Las Vegas, Nevada 89102

(702) 870-8700

14

Exhibit 6

# Special Comment Codes
## By Category Within Portfolio

| Category | Description | Credit Line | Installment | Mortgage | Open | Revolving |
|---|---|---|---|---|---|---|
| Special Payment Arrangements, continued | Voluntarily Surrendered, then Redeemed | - | AO | - | - | AO |
| | Account Paid in Full for Less than the Full Balance | AU | AU | AU | AU | AU |
| | Account Paid from Collateral | AX | AX | - | - | AX |
| | Paid by Company which Originally Sold the Merchandise | - | BN | - | - | - |
| | Paid through Insurance (Requires Account Status Code 13 or 61-65 and Current Balance = 0) | BP | BP | BP | BP | BP |
| | Principal Deferred/Interest Payment Only | - | BT | - | - | - |
| Transferred | Account Closed Due to Transfer | AT | AT | AT | AT | AT |
| | Loan Assumed by Another Party (Requires ECOA Code T — Terminated) | - | H | H | - | - |
| | Account Transferred to Another Lender | O | O | O | O | O |
| | Purchased by Another Lender | AH | AH | AH | AH | AH |
| | Student Loan — Permanently Assigned to Government | - | AL | - | - | - |
| | Account Acquired by RTC/FDIC/NCUA | AN | AN | AN | AN | AN |
| | Transferred to Recovery (Requires Account Status Code 71-97) | BA | BA | BA | BA | BA |

EXHIBIT I